**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **LOUIS VUITTON MALLETIER, S.A.S.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CASE NUMBER** |
| ) | **1:23-cv-02818-VMC** |
| **CONTOUR 5151 ONH, LLC, a Georgia** ) | |
| **Limited liability company d/b/a** ) | |
| **OLD NATIONAL DISCOUNT MALL;** ) | |
| **PRETAS DEDVUKAJ;** ) | |
| **ABC CORPS. 1-10; and JOHN DOES** ) | |
| **1-10 individually,** ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SANCTIONS
<u>AGAINST DEFENDANT CONTOUR 5151 ONH, LLC</u>**

## I.    INTRODUCTION AND BACKGROUND

Marshal Rhodes is a nonparty upon whom Louis Vuitton has forced an incredible discovery burden. After being served with her initial subpoena in 2024, she was contacted by, and had substantive conversations with, counsel for both Contour and Louis Vuitton. Rhodes consistently represented that she was not in possession of any documents that were relevant to this case. Following Rhodes's deposition, Contour's counsel suspected Rhodes may actually have more documents in her possession than she thought. Upon this realization, Contour's counsel immediately started to conduct formal e-discovery and recover documents from her personal phone and email. Recognizing that Rhodes was a lightning rod for discovery disputes, counsel erred on the side of over-producing so as to provide Louis Vuitton with all available context. Louis Vuitton has chosen to ignore that context and, instead, cherry-pick documents in an attempt to show widespread bad faith spoliation and other sanctionable conduct.

The Rhodes production does not show any bad faith intent to deprive Louis Vuitton of documents. It appears that, in trying to cobble together a circumstantial showing of bad faith, Louis Vuitton takes liberties with documents and often misstates or overstates their relevance or meaning, or takes documents wholly out of context in an effort to emphasize its allegations of wrongdoing. Louis Vuitton's requested sanctions are not appropriate when supported by mere conjecture.

## II.    ARGUMENT

### A.    Rhodes's documents do not prove that Contour engaged in bad faith spoliation.

The facts do not show that any spoliation actually occurred, and they certainly do not show there was any bad-faith spoliation, either from Contour's employees or Rhodes.

> #### 1.    *The fact that there are text messages within the Rhodes production that included various Contour Custodians which were not previously produced does not mean Contour spoliated those text messages.*

Though it appears that there were text messages on Rhodes's phone that involved the Contour Custodians[1], the fact that these text messages were not previously produced does not indicate bad faith spoliation because (a) Louis Vuitton did not properly account for the procedural differences between the Rhodes text message production and the Contour Custodians' text message productions, and (b) there is no indication that Contour engaged in bad faith spoliation of these text messages.

> ##### a.    *Louis Vuitton did not properly account for the procedural differences between the Rhodes text message production and the Contour Custodians' production.*

The Rhodes production did not undergo the same relevance review that accompanied the text message productions of the other Contour Custodians. The text

---

[1] "Contour Custodians" shall mean Defendant Dedvukaj, Carla Henderson, Latasha Dia, David Dedvukaj, Nora Prekelezaj, and Marcus Foucha.

2

messages of the Contour Custodians were reviewed for responsiveness subject to the timely objections made by Contour's prior counsel, which included relevance to the issues of the litigation. Ex. A at pg. 3, ¶ 5. The process for creating the Rhodes production was markedly different. For various reasons, but primarily in an effort to err on the side of providing full context and avoid needless discovery disputes, nearly every single text message between Rhodes and any Contour-affiliated individual was produced in its entirety.  Ex. B at pg. 2, ¶ 3. *Except for a limited sample of highly personal messages, none of Rhodes's texts with Contour-affiliated individuals were withheld based on a determination of irrelevance to the issues of this case.* Ex. B at pg. 2, ¶ 4. Therefore, any comparison between the Rhodes productions and the Contour Custodian productions is, at best, an apples-to-oranges comparison.

To create an apples-to-apples comparison for the purposes of this Court's review of the sanctions matter, Contour's counsel analyzed the Rhodes text messages to determine how many text messages were produced from the Rhodes production which also existed, at least at some point, on a Contour Custodian's phone. Ex. B at pgs. 2-3, ¶¶ 5-6. The results of this analysis show that there are 329 text message documents produced by Rhodes that, at least at one point in time, existed on the phone of at least one other Contour Custodian. Ex. B pg. 3, ¶ 7.

Again, recall that the Rhodes production was not produced with relevance in mind. Therefore, to make the comparison apples-to-apples, Contour's counsel

3

undertook a post-hoc responsiveness and relevance review of those 329 text message documents. Ex. B at pgs. 3-4, ¶¶ 7-8. Contour finds that only 18 of the 329 text message documents are arguably responsive and arguably relevant to the issues of this case, including the example text messages which were discussed in Louis Vuitton's supplemental brief. Ex. B at pgs. 3-4, ¶¶ 7-8. Of these relevant text messages, nearly all seem to relate to communications immediately following the raid. Ex. B at pgs. 3-4, ¶¶ 7-8.

<blockquote>

b.      *There is no indication that Contour engaged in bad faith spoliation of these text messages.*
</blockquote>

Regardless, the absence of these messages does not indicate *bad faith* spoliation. As an initial matter, it is not clear that any deletion of these text messages by the Contour Custodians would qualify as spoliation because these text messages are not crucial to proving Louis Vuitton's prima facie case for contributory trademark infringement. *See Dodson v. Belk, Inc.*, 362 F. Supp. 3d 1283, 1288 (N.D. Ga. 2018). On review of the documents, there is nothing in those texts that show knowledge of or material contribution to the allegedly infringing activity.

Even if these text messages contained content crucial to Louis Vuitton's prima facie case, there is no evidence that Contour spoliated in bad faith. A showing of bad faith must be more than mere negligence or even gross negligence. *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1312 (11th Cir. 2023). Here, it seems that some text messages were not preserved by Defendant Dedvukaj, Carla

Henderson, or Latasha Dia. But each of these custodians did produce other text messages, including text messages which are, arguably, unfavorable to Contour's position. *See e.g.,* Ex. C. If it was Contour's intent to deprive Louis Vuitton of information, why would it produce unfavorable documents and then destroy harmless texts discussing a raid which was certainly not a secret?

Moreover, the Contour Custodians did not deliberately delete anything from their cell phones. Ex. D at pg. 2, ¶ 3. The text messages highlighted in Louis Vuitton's motion are largely from Late 2022 / Early 2023, six months before this litigation ensued. It is not outside the realm of possibility that these texts were deleted either before the duty to preserve was established, or before any of these custodians were specifically identified or targeted in such a way as to make them aware that text messages on their personal phones should be specifically preserved. Mere negligence, even gross negligence, does not sustain a claim for bad faith spoliation. *Compare Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1302 (M.D. Fla. 2009) (finding sanctions warranted when there was evidence of deliberate and complete destruction of text message and email data and such data was not recoverable or otherwise knowable) *with Kadribasic v. Wal-Mart, Inc.*, No. 1:19-CV-03498-SDG, 2021 WL 1207468, at *4 (N.D. Ga. Mar. 30, 2021), aff'd, No. 21-14177, 2023 WL 6457250 (11th Cir. Oct. 4, 2023) (declining to find an adverse

inference sanction was appropriate in response to the deletion of email where the bad faith spoliation allegations are based on only "speculation and conjecture".)

Accordingly, Louis Vuitton has not shown bad faith spoliation of text messages between Rhodes and other Contour Custodians.

### 2. *Contour is not responsible for any documents deleted by Marshal Rhodes.*

Contour is not responsible for any documents which Rhodes may have deleted because (a) it is not clear that anything relevant was actually deleted and (b) even if documents were deleted, Rhodes was not under Contour's direction or control when such alleged deletion occurred.

> a. *Rhodes's testimony regarding document deletions does not align with what we know based on the documents collected from her, therefore there is a significant question about whether anything was actually deleted.*

It is uncontroverted that Rhodes *thought* that she deleted text messages and emails. Rhodes testified that she searched and that she did not have texts withs Carla Henderson, Latasha Dia, or any other Contour employee, *therefore* she concluded those texts must have been deleted. *See* Ex. E at 68:18-69:2; 69:12-22. When asked how she conducted her searches, Rhodes testified that her email search only included searching the word "Contour." Ex. E at 61:12-22. The text message search appears to have been done based on similar keyword searches for names like "Pete" or "Latasha." Ex. E at 64:13-19.

6

After her deposition, her phone was imaged in its entirety, and clearly text messages were found, *thousands of them*. The produced text messages appear to be full chains between Marshal and Carla Henderson, Latasha Dia, Pete Dedvukaj, David Dedvukaj, Nora Dedvukaj (including combinations of those individual), as well as other employees or contractors who worked at any Contour-related property during her employment.

Again, Rhodes is a nonparty and a laywoman; she is not experienced in formal discovery procedures. The evidence suggests that very little was actually deleted because Rhodes's basis for saying that texts must have been deleted was based on a layman's document search. That search has now been completed with a far greater scope and degree of accuracy than is typically required from a non-party, all at Contour's considerable expense.

> b.    *Regardless of whether Rhodes actually deleted what she testified was deleted, Louis Vuitton's attempts to implicate Contour as being responsible for that deletion is unconvincing.*

Regardless of the extent of Rhodes's alleged deletions, Louis Vuitton's attempt to implicate Contour in Rhodes's alleged deletion based on her communications with Contour's counsel is unconvincing. Rhodes is a nonparty and neither Contour nor Contour's counsel had any control over what she did with her personal phone. Rhodes consistently represented that she believed she did not possess any relevant information on her personal devices. Ex. A at pg. 3, ¶ 6. The

limited attorney-client relationship between Contour's former counsel and Rhodes did not begin until around March 2025. *Id*. While Contour's prior counsel may have spoken to Rhodes after the litigation began, *so did Louis Vuitton's counsel*. Ex. F. There are a total of seven calls to/from Marshal and counsel for Louis Vuitton (Joseph Ecker) from a period beginning in August 2024 through March 2025, for a total duration of 57 minutes. *Id*. The fact that these calls exist are evidence that Louis Vuitton did not view Rhodes as represented by Contour's counsel prior to March 2025, otherwise it would be an ethical violation for them to be in contact with her. Louis Vuitton's counsel could have discussed document preservation with Rhodes on any one of these phone calls.

In describing Contour's former counsel, Mr. Taube's, pre-suit involvement, Louis Vuitton again seems to intentionally overstate and mischaracterize evidence. Louis Vuitton argues that Mr. Taube "was involved in making key decisions regarding communications with law enforcement following the raid" based on a text message in which it is not even clear that the attorney Rhodes said she was going to call was Mr. Taube. Regardless, even if Rhodes did, in fact, speak to Mr. Taube about the communication with law enforcement following the raid, there is nothing that indicates this was some type of "key decision." Mr. Taube represented various Contour-affiliated entities prior to 2023 in various matters that have no relation to the claims against Contour in this case. Ex. A, pg. 2 ¶ 4.

Louis Vuitton's argument that Rhodes "continued tampering with and destroying evidence" after this Court's July 1, 2025 order to produce documents is based on scant evidence. Louis Vuitton presents an "artifact of activity" which allegedly shows tampering or destroying evidence, alleging that Ex. QQQ shows Rhodes tampered with documents by leaving a text conversation, but that text conversation was produced in its entirety. *See* Ex. G. Rhodes simply leaving the conversation did not delete or destroy any data. *See id*.

In sum, it is not clear that Rhodes ever deleted anything as she thought, given the voluminous production following a more complete search by Contour's counsel. Moreover, Contour is not responsible for any actions taken by Rhodes following her termination and prior to Contour's counsel's limited representation of her beginning around March 2025. Further, Louis Vuitton's claimed evidence that Rhodes deleted messages following the Court's July 1, 2025 order to produce documents is misguided, at best. Accordingly, Louis Vuitton has not shown that Contour is responsible for any documents that may, or may not, have been deleted by Rhodes.

**B.     Nothing in the Rhodes production suggests that Louis Vuitton's requested sanctions are warranted.**

There is nothing in the Rhodes production that shows that Contour spoliated documents or otherwise failed to fulfill their discovery obligations. First, Rhodes's documents do not indicate that a termination letter ever actually existed. Second, there is nothing to support Louis Vuitton's inference that there are transmittal

emails/texts about the January 2022 cease & desist letter that were spoliated. Third, Contour did not improperly withhold identities of Market Employees or provide false interrogatory responses and deposition testimony.

### 1.    *Contour did not spoliate Rhodes's termination notice.*

Nothing in Rhodes's production indicates that Contour spoliated Rhodes's termination notice, nor is there any support for Louis Vuitton's assumptions about what the notice (the very existence of which is in question) may or may not have said about the reasons for the termination. Louis Vuitton argues that the idea that the termination notice may have never existed is an "incredible suggestion." Doc. 162-2 at 15. What is incredible is Louis Vuitton's willingness to ignore all evidence that does not support their own fabrications. Louis Vuitton directs the Court's attention to an email sent from Rhodes to Latasha Dia shortly after Rhodes was terminated. The email simply says: ██████████████████████████ Doc. 162-2, Ex. FFFF. Louis Vuitton, however, goes an extra step to infer that such notice "was shown to her" and argues that this email shows that "clearly Rhodes believed the termination notice existed." Doc. 162-2 at pg. 15. When read in concert with Rhodes's deposition testimony, however, everything comes into focus.

> Q:    When Latasha met with you, did she provide you
>        with a written termination notice?
>
> A:    No, she did not.
>
> Q:    Okay. And did you ask for one?

A:    I think later on I did, yes. That's what one of the e-mails was about.

Q:    You e-mailed?

A:    Yes.

…

Q:    So why do you think you didn't receive a termination notice?

A:    I -- I think [Latasha] was going to come  back so we can talk about like getting a game plan. Because she told me to give her a minute and we were trying to figure out some things going on, and that was it. So she never came back.

Ex. E at 264:13-20 and 265:19-25.

All this email shows is that Rhodes was being honest during her deposition. She did not receive a written termination notice, so she followed up to ask for one at a  later time but received no response. Nothing about the exchange indicates that such a notice was ever actually created or that Rhodes ever saw any written notice. *See id.;* Doc. 162-2 (Ex. FFFF).

Louis Vuitton takes similar creative license with its representations of the significance of Ex. EEEE, which is a text message between Rhodes and Carla Henderson, in conjunction with the testimony of Rhodes and Defendant Dedvukaj. While Louis Vuitton argues that this message is proof that Defendant Dedvukaj was untruthful in his testimony about whether he spoke to Rhodes about the alleged bribery scheme, that is too bold a statement to make based on such a vague text

11

message. Moreover, such an isolated text message with dubious meaning certainly cannot be used as support for an argument that Contour purposely spoliated an alleged termination notice. Latasha Dia, Rhodes's supervisor, testified that Rhodes was not terminated because of any alleged bribery scheme. Ex. H at 335:11-337:10. The "evidence" that she was involved in such a scheme is based on information allegedly told to an employee (Foucha) with whom Rhodes did not have an amicable relationship. Ex. E at 240:14-241:1. These hearsay allegations have not been substantiated.

Louis Vuitton asserts that the Rhodes production included numerous examples that Rhodes knew the Mall was "overflowing with counterfeits" or that Rhodes "did indeed take bribes." It is tempting to walk the Court exhibit-by-exhibit and argue whether any of these exhibits do, in fact, support that argument. However, such an exercise would just be a distraction. Louis Vuitton asks this Court to sanction Contour for bad faith spoliation. Even assuming that every single exhibit referenced in Louis Vuitton's Argument § B.1. signifies *exactly* what Louis Vuitton says it does (and they do not), and that there is evidence of bribery-taking (which there is not), the logical connection to *Contour's* alleged spoliation is absent. Rhodes was sent to work at other properties and was no longer managing the Mall *before* Marcus Foucha accused her of taking bribes. Ex. E at 242:12-243:11. She was terminated for her performance in relation to those other properties. *See* Ex. H at 335:11-337:10.

12

To the extent this Court finds Louis Vuitton's discussion of alleged bribe-taking evidence persuasive in the context of whether Contour spoliated documents, Contour would point out that (once again) Louis Vuitton's evidence is not what they purport it to be.[2] If the Court finds these documents ambiguous, that ambiguity should not be automatically assessed as a penalty against Contour in the form of an adverse inference crafted by Louis Vuitton. The Rhodes deposition was left open specifically in case any questions arose from a review of her document production, and that is the appropriate avenue to clarify any questions arising from these documents.

Accordingly, Louis Vuitton has not shown that any of the Rhodes documents support their argument that a termination letter existed, that such letter shows that Rhodes took bribes, or that Contour spoliated Rhodes's alleged termination letter.

---

[2] Contour does request, however, that the Court be critical of the alleged "evidence." In addition to the documents not, in fact, demonstrating that any of the alleges bribes were actually requested by, paid to, or received by Rhodes, especially with regard to any purported bribes relating to Louis Vuitton, these are further examples of Plaintiff conflating and misstating documents to create new "truths" from which they ask the Court to enter sanctions and corrective instructions. As but one example, Plaintiff has represented to the court that a video (Ex. XXX and YYY) is related to and explained by a "subsequent" text message (Ex. ZZZ), despite the video and text message being separated by seven months.

### 2.    *Contour did not spoliate Louis Vuitton's notice letters to Contour.*

The documents from the Rhodes production do not provide any support for Louis Vuitton's arguments that any letters sent from Louis Vuitton were destroyed or improperly withheld. Previously, Louis Vuitton argued that the origins and details surrounding the disposition of the January 2022 letter were in question, and thus the lack of produced texts discussing this letter was a reason for discovery sanctions. Doc. 122-1, pgs. 22-23. Insights from the Rhodes production actually seem to indicate that Louis Vuitton's questions are now answered. The text message Louis Vuitton highlights shows that Rhodes received a copy of the letter from a security guard on January 8, 2022. Doc. 161-2 at pg. 16 (referencing Ex. GGGG). The existence of these pictures on Rhodes's phone does not indicate that they were ever forwarded on, either via text or via email, to other individuals like Defendant Dedvukaj, Latashia Dia, or anyone else.

Louis Vuitton asks this Court to adopt their inference that the lack of emails or text messages from Rhodes to someone else at Contour means that these emails must have been deleted, referencing several places in Rhodes's deposition that purportedly confirm that "this is exactly what Rhodes testified happened with another Louis Vuitton cease and desist letter." Doc. 161-2 at pg. 17. On review of the testimony cited by Louis Vuitton, the only thing that can be fairly said is that Rhodes does not clearly remember this letter or the circumstances surrounding this

14

letter. For example, Louis Vuitton directs this Court to page 32 line 7 through page 36 line 6, though the Court should continue to read through page 38. Doing so reveals that Rhodes cannot identify the exhibit as the letter she was discussing. She also testifies that, while she received a letter from Louis Vuitton, she cannot remember when she received it. Ex. E at 291:10-293:2.

The assumption that the Court should infer Rhodes *must* have forwarded the letter to other Contour employees (and therefore such text messages *must* of have been spoliated) cannot be based on testimony as unclear and contradictory as that cited by Louis Vuitton. Again, the remedy to resolve any factual question on this point is to continue the deposition of Rhodes, which was left open specifically in case follow-up questions needed to be asked based on documents she produced.

Accordingly, the Rhodes documents do not support Louis Vuitton's argument that *Contour* spoliated any alleged notice letters.

> ### 3. *Contour did not withhold identities of Market Employees or provide false interrogatory responses and deposition testimony.*

Contour did not withhold the identity of Market Employees. The "Contour Team" text thread did not involve texts solely about Mall operations. Rather, it appears to be a thread that encompassed the management of many Contour-related properties in the Atlanta area over which Rhodes was managing, including various apartment buildings. Moreover, the "undisclosed" individuals, including Christian

Johnson, Daniel Joyl, Markesha, Gibbs, Tevin, and Tyron Price, were not significantly involved in Mall operations or management. Ex. D, pg. 2 ¶5. For example, Tyron Price left the Contour Team chat within days of its creation. Ex. J. Contour was not under the obligation to formally disclose the name of every single employee and security contractor who ever received a text message that related to the Mall.

At this point, we can only speculate as to why some of these messages were not produced as part of Carla Henderson's production. It does not appear that any of the messages from the "Contour Team" text thread were included in the original document collection from her cell phone. The thread appears to have gone inactive before the raid occurred. It is certainly possible that Carla Henderson deleted the thread prior to the raid or in any one of the 8 months between the raid and when the Complaint was filed, during which time she was not under any obligation to preserve these texts.

More importantly, even if these "Contour Team" texts had been collected from Henderson's phone, only a small portion of the texts would have been reviewed per the ESI protocol agreed upon between Contour's former counsel and Louis Vuitton, which stated that "for any threads that exceed 500 texts in length, search terms will be applied." Doc. 161-4. The "Contour Team" thread had more than 500 texts, thus only texts which included a search term would have been reviewed. After

16

applying the previously-agreed upon search terms, only 67 "Contour Team" text chains involved text messages which hit on a search term. And, of those 67, only 2 of them are even *arguably* relevant to the issues of this case. *See generally,* Ex. B (describing post-hoc analysis used to determine arguable relevance).

Next, Louis Vuitton argues that Contour should have disclosed an individual named Vasel Dedvukaj as a person who was involved in Contour's Atlanta operations, including the Mall. Vasel Dedvukaj was not significantly involved in Mall operations.[3] Ex. D, pgs. 2-3 ¶6. Vasel Dedvukaj was occasionally hired on a case-by-case basis for demolition and coordinating construction matters. *Id*. Vasel's name was not mentioned at any point during the depositions of any one of the nine Contour-related witnesses, and this is not because of a scheme to obscure his involvement. Vasel did not come up because Contour did not believe him to have any information that would have been relevant to this litigation as he was not involved with Mall operations. *Id*. Louis Vuitton had the opportunity to depose every single Contour manager or supervisor that was involved, in any way, with the Mall. Ex. D, pg. 2 ¶ 7.

---

[3] Louis Vuitton's statement that Vasel Dedvukaj was included or mentioned in "over 75 text chains produced by Rhodes" risks the Court forming an impression that overstates his involvement. The Rhodes text messages were produced broken by day, by group. To get a sense of context, there were 1,435 "text chains" produced by Marshal Rhodes under Louis Vuitton's definition.

17

Contour had no reason to believe that any of the "undisclosed" individuals in the "Contour Team" text thread were involved in management of the Mall, and none of them would be expected to have any knowledge of the facts or allegations of the Complaint, and the same can be said for Vasel Dedvukaj. Ex. D pgs. 2-3 ¶¶ 5-6. Louis Vuitton's requested sanctions are not warranted simply because Contour did not formally disclose the name of every contracted security guard or office worker that stepped foot in the Mall during Contour's ownership.

Accordingly, the Rhodes documents do not support Louis Vuitton's argument that Contour withheld identities of Market Employees or provided false interrogatory responses and deposition testimony.

## C.   Louis Vuitton's counsel routinely misrepresents arguments as fact.

Contour understands that the American system is designed to be adversarial, but when significant portions of a brief must be dedicated to simply highlighting and correcting the instances where opposing counsel misled the Court, that is not adversarial. That is Louis Vuitton's counsel outsourcing their duty of candor. In responding to Louis Vuitton's allegations, Contour attempted to draw attention to a few of the specific places where Louis Vuitton's misrepresentations or overstatements are most problematic, but those examples are by no means exhaustive. Louis Vuitton has taken such great liberties with its representation of "evidence" from a nonparty to unfairly impute "knowledge" and action to Contour.

18

Given the extreme sanctions requested by Louis Vuitton as a result, Contour asks that the Court exercise vigilance when considering Louis Vuitton's arguments and exhibits, particularly in this Court's review of whether the offered evidence actually conveys what Louis Vuitton asserts.

## III.    CONCLUSION

For the reasons set forth above and in its original response to Louis Vuitton's Motion for Sanctions (Doc. 136), Contour respectfully requests that Louis Vuitton's Motion for Sanctions be denied in its entirety.

Respectfully submitted, this 4th day of February, 2026.

**STITES & HARBISON, PLLC**

*/s/ Julie C. Cahill*
Thomas J. Mihill
Georgia Bar No. 001363
Julie C. Cahill
Georgia Bar No. 380547
*Counsel for Defendant,*
*Contour 5151 ONH, LLC*

303 Peachtree Street, N.E.
Suite 2800
Atlanta, Georgia 30308
Office:404-739-8800
tjmihill@stites.com
jcahill@stites.com

19

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been

prepared in compliance with Local Rule 5.1(B) in 14-point Times New Roman type

font.

This 4th day of February, 2026.

**STITES & HARBISON, PLLC**

*/s/ Julie C. Cahill*
Julie C. Cahill
Georgia Bar No. 380547

303 Peachtree St. NE
Suite 2800
Atlanta, GA 30308
404-739-8800 - Office
jcahill@stites.com

20

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing **DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SANCTIONS** on all counsel of record by electronic email via CM/ECF.

This 4th day of February, 2026.

                                                 **STITES & HARBISON, PLLC**

                                                 */s/ Julie C. Cahill*
                                                 Julie C. Cahill
                                                 Georgia Bar No. 380547
                                                 *Counsel for Defendant,*
                                                 *Contour 5151 ONH, LLC*

303 Peachtree Street, N.E.
Suite 2800
Atlanta, Georgia 30308
Office: 404-739-8800
jcahill@stites.com

21