

## Planet Depos
*We Make It Happen*™

**CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED**

# Transcript of Marshal Rhodes

**Date:** August 25, 2025
**Case:** Louis Vuitton Malletier S.A.S. -v- Contour 5151 ONH, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LOUIS VUITTON MALLETIER S.A.S.,
:
:
:
            Plaintiff,        :
:
      vs.                     : CIVIL ACTION FILE NO.
                              : 1:23-CV-02818-VMC
CONTOUR 5151 ONH, LLC, A      :
GEORGIA LIMITED LIABILITY     :
COMPANY D/B/A OLD NATIONAL    :
DISCOUNT MALL; ABC CORPS.     :
1-10; AND JOHN DOES 1-10,     :
INDIVIDUALLY,                 :
                              :
            Defendants.       :

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

VIDEOTAPED STENOGRAPHIC DEPOSITION OF

MARSHAL RHODES

ATLANTA, GEORGIA

MONDAY, AUGUST 25, 2025

REPORTED BY:  TANYA L. VERHOVEN-PAGE,
              CCR-B-1790

FILE NO.  597446

**Page 2**

August 25, 2025

10:43 a.m.

Videotaped stenographic deposition of MARSHAL RHODES, held at the offices of Stites & Harbison, PLLC, 303 Peachtree Street, N.E., Atlanta, Georgia before Tanya L. Verhoven-Page, Certified Court Reporter (GA), Licensed Court Reporter (TN) and Certified Shorthand Reporter (TX).

**Page 3**

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

      STEPTOE, LLP
      1330 Connecticut Avenue, N.W.
      Washington, D.C. 20036
      (202) 429-3900
      BY:  JOSEPH F. ECKER, ESQ.
           e-mail: jecker@steptoe.com

On behalf of Defendant Contour 5151 ONH, LLC:

      STITES & HARBISON, PLLC
      303 Peachtree Street, N.E.
      Suite 2800
      Atlanta, Georgia 30308
      (404) 739-8800
      BY:  THOMAS J. MIHILL (TJ), ESQ.
           e-mail: tjmihill@stites.com

**Page 4**

APPEARANCES OF COUNSEL

On behalf of Defendant Pretas Dedvukaj:

      WEINBERG, WHEELER, HUDGINS, GUNN & DIAL
      3344 Peachtree Road, N.E.
      Suite 2400
      Atlanta, Georgia 30326
      (404) 876-2700
      BY:  JOSHUA E. SWIGER, ESQ.
           e-mail: jswiger@wwggd.com

ALSO PRESENT:

      Jonathan Thompson, Videographer

                  -    -    -

65

A   Yes.
Q   And did you find anything?
A   Yeah.
Q   You did?
A   Yeah.
Q   Okay.  And did you give those texts to your attorneys?
A   Yes.
Q   You did?
A   Yes.
Q   Which attorneys?
A   Recently.
MR. ECKER:  Okay.  I will represent for the record that no texts have been produced in this case.
So, Ms. Rhodes, did you give them to Mr. Mihill or Mr. Taube?
THE WITNESS:  Mr. Mihill.
MR. ECKER:  Mr. Mihill, are you in possession of any texts?
MR. MIHILL:  I am not.  I think there might be some --
I know you talked about searching things and getting us the documents, but I don't think we ever got them.

66

THE WITNESS:  Oh.  I only had like a couple, but I thought I scanned it over and sent it.
MR. MIHILL:  I'll tell you that we can follow up on that.  I was not aware that any had been found, but we will get those to you ASAP.
BY MR. ECKER:
Q   And so approximately how many text messages did you find in your phone?
A   Probably like five.
Q   And what were they related to?
A   They were related to my travel expenses and leaving my W-2, something like that.  That was it.
Q   And are those the only things you ever texted people at Contour about while you worked there?
A   Yes.
Q   Did you text them about other things while you worked there?
A   Yes.
Q   Okay.  So was it normal for you to text while you worked at Contour?
A   Yeah.

67

Q   And did you text other employees?
A   Yeah, a little bit, yes.
Q   And did you text like the tenants that --
A   No.
Q   You never texted a tenant?
A   No.
Q   So did you find any of these other texts with employees when you searched for them recently?
A   No.
Q   Why didn't you find them?
A   Because I didn't text any employees recently.
Q   I'm sorry?
A   I didn't text any employees recently, only Latasha and Pete about my W-2 and my separation notice or my reimbursement and whatever I found with that part.  So the last few months when I was there.
Q   Okay.
A   Nothing else.
Q   So you texted Pete and Latasha about your separation notice?
A   Yes.
Q   Did you receive --
A   I e-mailed one of them.
Q   Did you receive a separation notice?

68

A   No.
Q   So what were you texting them about?
A   Receiving a separation notice.
Q   Okay.  So you e-mailed Pete and Latasha for a separation notice?
A   And my W-2 and my reimbursement.
Q   And did you -- did you request -- strike that.
So you requested a separation notice from Pete and Latasha?
A   I did from Latasha.
Q   What did they say to you?
A   She never responded.
Q   Okay.  And when did you do this?
A   At the end of my -- after I was let go.
Q   Okay.  I just want to back up a little bit.
I think you -- did you say that you -- you would text other employees while you worked at Contour?
A   Carla, Latasha.
Q   Okay.  Did you search for those texts in response --
A   I did, I deleted them.  I hadn't been in there in two years, so I didn't have anything else.

69

Q    And when did you delete them?
A    I don't remember when I deleted them.
Q    Would it have been after you worked for Contour or while you were still there?
A    Well, certain things, it's just not important so I don't do them.  But like I said, it was only Pete and Latasha after I left and that was it.
Q    So you texted with Pete and Latasha after you left?
A    Yes.
Q    Okay.  And for texts with other employees while you were still working at Contour, you think they've all been deleted?
A    I don't have anything.  Yes.
Q    And did you check?
A    Yes.
Q    Did you check your -- I -- do you have an iPhone?
A    I do.
Q    And did you check your iCloud backup?
A    No.
Q    And just how often would you text while you worked at Contour with other employees?
A    Not often.

70

Q    Not often, okay.
MR. ECKER:  I'm going to mark a document as Exhibit 5.  And this is a document Bates label Contour_0038674.
(Rhodes Deposition Exhibit No. 5 was marked for the record.)
BY MR. ECKER:
Q    Ms. Rhodes, you may have never seen a document like this before, but I will represent to you that this is a -- a series of text messages that have been produced in this case, and this is how they appear when they are produced.
So do you see a date range at the top right?
A    Uh-huh.
Q    And you see it says February 29th, 2022 to February 9th, 2023?
A    Uh-huh.
Q    Do you see it says Total Messages, 115?
A    Yes.
Q    Do you see your number there where it says:  Ms. Marshal (704)870-1854?
A    Uh-huh.
Q    Is that your phone number?
A    Yes.

71

Q    All right.  Do you see there it also says Latasha, with a phone number listed there, as well?
A    Yes.
Q    All right.  And there's -- and it appears there's some other number there, as well?
A    I don't know what that is.
Q    Okay.
A    I don't know that number.
Q    Do you mind just flipping through this.
And does this appear to be a text conversation between yourself and Latasha and some other individual?
A    Chat275 or something?
Q    Just -- just flipping through this document, does it appear to be a text conversation between yourself and Latasha Dia and one other individual?
A    Well, I -- I see my name, Latasha.  I don't know the other individual that you're saying.
Q    Okay.  I'll just -- if you don't mind turning to -- there's a page that ends in 38683.
A    38683?
Q    Yes.
A    Okay.
Q    Do you see the third to last text message

72

there is a text from you at 2:51 p.m. on January 3rd, 2023?
A    Hey, Ms. Marshal.  Other than the last update?
That?
Q    Correct.  Do you see where it says: Other than the last update, I'm sending you month end total/repairs.  Pete said he was going to sit down with them and our attorney.  Would that be Greg?
Do you see that?
A    Yes, I think so, yes.
Q    Is that Greg Taube you're referring to?
A    I would assume, yes.
Q    So before we looked at this document, when you told me that you didn't text very often, is that -- I mean, do you still stand by the fact that you say you didn't text very often while you were at Contour?
A    I still don't text often.  No, not very often.
Q    This text thread has 115 messages in it.
A    Over three --
MR. MIHILL:  Object to form.
You can answer.
THE WITNESS:  From 2022 to 2023,

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

Transcript of Marshal Rhodes

60
(237
to
240)

Conducted on August 25, 2025

237

A Yeah. He wasn't happy.

Q Okay. After that, do you recall anything else from that encounter?

A Myself and Marcus had words, because I fined -- the team fined Marcus quite a bit, so I was surprised that he was in a position to then be a manager.

Q I'm sorry. I didn't catch the first part of your statement.

A The team fined Marcus quite a bit for violations.

Q They fined him?

A They fined him.

Q I see. And what kind of violations?

A Like leaving late, trash everywhere, going back and forth with the security guards, always late closing. Things like that.

Q Do you know if Marcus ever sold counterfeit products?

A No.

Q Do you know if he ever sold Louis Vuitton products?

A No, not to my knowledge. He was -- had a painting business, as far as I know.

Q When did this conversation -- do you

238

recall approximately when the conversation took place between Pete and Marcus that you were present at?

A I don't.

Q And it was sometime after the raid?

A I would -- yes.

Q And where did this conversation take place?

A At Cranbrook.

Q Cranbrook Townhomes?

A Yes.

Q So is that -- well, how did you learn that that conversation related to allegations that you had accepted bribes?

A Like I said, Pete said something to me about it. He didn't go into detail.

Q So after the conversation between Pete and Marcus, Pete talked to you?

A A little bit, but he didn't go into detail. He was just not happy about it. He was mad.

Q What did he say to you?

A He didn't say anything to me. He was just not happy about it.

Q Happy about what?

A The conversation.

Q How did you know it related to

239

allegations of bribes against you?

A He said -- he said something about me and it wasn't good. He didn't like it.

Q What did he say?

A That's all he said.

Q Well, how did you know it related to allegations of bribes against you?

A I don't know, but the point was I know he said it was something to do with Marcus having some type of a reason to feel like that was going on. But it was on -- oh, you know what. I apologize.

Latasha and I had talked about that prior, and also the attorneys told me. So that's the part where I know how I know about that.

Q Okay.

A Yeah.

Q So I want to pause for a second and we'll stick with the conversation between Pete and Marcus. After that conversation, Pete said something to you?

A Pete never said anything to me. He just wasn't happy. I've not spoken to Pete at all hardly since then. Just in the office setting. That's it.

Q So he made some comment to you after this conversation?

240

A He wasn't happy.

Q Okay. And after that comment, did you ever -- when was the next time you spoke to Pete?

MR. MIHILL: Object to form.

THE WITNESS: At the office in Alabama.

BY MR. ECKER:

Q And what did you talk about with him?

A Just staff stuff. Nothing related to the mall.

Q Did he ever discuss the allegations of bribes against you?

A He did not.

Q Did you discuss the allegations of bribes against you with Marcus Foucha?

A Who is Marcus?

Q I apologize if you don't know his last name. The Marcus at the Old National Discount Mall.

A No. He -- no, no.

Q I think a minute ago you said he had choice words about you. What were you referring to?

A We went back and forth with each other when I saw him at the mall office outside, and I -- he knew I didn't care for him just for him giving us a hard time from working and that type of thing, and

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

Transcript of Marshal Rhodes

Conducted on August 25, 2025

61
(241 to 244)

---

**Page 241**

him not being honest. So --

Q    And when did that occur?

A    I don't know. It was a little bit after the mall reopened.

Q    After the mall reopened?

A    Yeah, I think so.

Q    And you were outside the office at the mall after the mall reopened?

A    Yeah.

Q    And why were you there?

A    Because I worked there.

Q    At the mall after it reopened?

A    Yeah, on the outside of the mall. We were in the parking lot just talking.

Q    Okay. Do you recall when the mall reopened?

A    I don't remember exactly, but I know the mall -- I think the mall was open by then.

Q    Okay. Earlier, I think you told me that you might have stopped working at the mall around March or April of 2023. Does that sound about right, or no?

A    I don't remember exactly. I just know I just stopped going after it opened. I didn't go inside, I didn't do -- I wasn't involved in that part

---

**Page 242**

anymore.

Q    But the mall was open when you met and had this conversation with Marcus?

A    I don't remember exactly. I just know we were outside in the parking lot.

Q    And what did Marcus say to you?

A    I don't -- I don't really remember. I just know -- I just know that he and I don't really communicate because he was just another factor to me. He was just somebody that they brought in not knowing what's going on, and it was just a bit much for me.

Q    Did he say anything to you about the allegations of bribes?

A    No.

Q    This conversation between Pete and Marcus, did that occur before or after you were reassigned to the Alabama properties?

A    I was already at the Alabama properties.

Q    Okay. So why were you at Cranbrook Townhomes?

A    That was the main office for me.

Q    That's where you worked out of?

A    Yes.

Q    Okay. So you spent most of your time working out of Cranbrook?

---

**Page 243**

A    No.

Q    Where did you work out of?

A    I worked out of all the offices, but when I was here, the main property was Cranbrook.

Q    Okay. So when you were reassigned to these Alabama properties, were you still managing other Contour properties?

A    I was at Cranbrook, as well.

Q    So Cranbrook and the Alabama properties. What other properties were you managing?

A    That was it.

Q    You mentioned you had a conversation with Latasha. Tell me about that.

A    At what time?

Q    Well, I think a couple minutes ago you told me that you had a conversation with Latasha about these bribery allegations against you.

A    She asked me, somebody sent her something and we talked about it briefly. She was like, I knew it was crazy, it didn't make sense, and she checked it out. She was like it didn't even -- they didn't respond or something like that. I don't remember exactly. But she mentioned it to me.

Q    So Latasha received some information that -- well, why don't you tell me. What did

---

**Page 244**

Latasha tell you?

A    I don't recall her -- her spiel word-for-word, but she was like she had heard, somebody sent her something, she said it was ridiculous. And she followed up with it and asked me questions. She said it didn't make sense. And that was when she told me about it.

Q    Do you recall when she told you about this?

A    No.

Q    And do you recall what specifically this person told her?

A    Like I got $72,000 or something like that.

Q    So you're aware that somebody made an allegation against you for accepting money to Latasha Dia?

A    I would guess I would say yes.

Q    And did you ever accept $55,000 from a tenant at Old National Discount Mall?

A    No.

Q    Did you accept $75,000 from a tenant named Shamsha Huponi (phonetic)?

A    I don't know who that is. No.

Q    Do you know who Shamsha Huponi is?

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

66
(261
to
264)

Transcript of Marshal Rhodes

Conducted on August 25, 2025

261

there.

BY MR. ECKER:

Q   You were already working at the Alabama properties?

A   I was, yes.

Q   So they just had you stop working at the Old National Discount Mall?

A   The mall was closed.

Q   Okay.  Well, why didn't you go back when it reopened?

A   Because of all the extra stuff.

Q   What other stuff?

A   Having to reopen, finding out what was going on, going back and forth with the tenants, them being ready to be in.  The market in Alabama not doing good, losing employees and things of that nature.

Q   What does that have to do with you not continuing working at Old National Discount Mall?

A   Like I said, the mall wasn't open at first, so it's part of my salary, as well.  And with it being closed several months, I'm sure it had a big impact.

Q   So were you paid less after you stopped working at Old National Discount Mall?

262

A   I was to a point, yes.

Q   How much did you -- how were you compensated by Contour?

A   My salary was $100,000 a year.  I got bonuses at the end of the year, but I was only at probably about 75 percent.  So once I got to the end of the year, that's when we get our bonus structures.

Q   And what did you get a bonus for?

A   Collections, work performances, site performances, things of that nature.

Q   So if a property made more money in rent collections, you would get a bigger bonus?

A   The bonus still would be tied into the same amount that was agreed to.

Q   What do you mean by that?

A   Whatever was structured in my -- my offer letter.  Like if -- let's say if you made -- if the property is at $100,000 and we kept that average every month at collections, depending on what we would collect, that's where our bonus structures would be at.  If it was 10 percent or 5 percent.

Q   Were you ultimately fired by Contour?

A   I guess I was -- I would say yes.

Q   Okay.  And when were you fired?

A   July '22.

263

Q   Okay.  And walk me through that.  Who fired you?

A   Latasha.

Q   Okay.  And how did that happen?

A   She just asked me to meet her and she wanted to talk over some things.  We didn't -- she didn't really finalize anything, but she was like, you know, it's just not really working.  We already had a meeting with Pete.  He was like, the numbers are way down, and he was just not happy, we would need to make some changes.  We'd probably cut about 20 or 30 people prior before that, and then I was next.

Q   Where did this meeting occur?

A   In Alabama.  Well, she and I occurred here, in Georgia.

Q   So you met with Latasha Dia here in Atlanta?

A   Yes.

Q   All right.  And prior to that meeting, did you have, you know, any -- any notice that you might be fired by Contour?

A   No.

Q   Were you surprised?

A   No, not besides like I said, Pete had

264

talked to us about the numbers being down and he wanted us to be more productive in Alabama.  And he really wanted to see a change and he was going to hire a management group, and he hired a management group at that level.

Q   And you were still working at other properties for Contour here in Atlanta though, right?

A   It was all tied in the same spaces.

Q   You were working for Cranbrook here in Atlanta still?

A   Right.  I think we had just sold Cranbrook, as I remember.

Q   When Latasha met with you, did she provide you with a written termination notice?

A   No, she did not.

Q   Okay.  And did you ask for one?

A   I think later on I did, yes.  That's what one of the e-mails was about.

Q   You e-mailed?

A   Yes.

Q   And you asked them for a formal termination notice?

A   I was kind of referencing to my W-2 and my mileage reimbursement, my reimbursement checks, for a few months.

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

Transcript of Marshal Rhodes

Conducted on August 25, 2025

265

Q    And while you were working for Contour, I mean, did you -- were you involved in terminating any employees?

A    Yes.

Q    All right.  And when you terminated those employees, did you give them a termination notice?

A    Yes, I'm pretty sure.

Q    Do you know whether you're required to do something like that?

A    Yes.

Q    You are required to?

A    I think so -- well, I try to make sure I do it myself, or Carla.

Q    And is that like a Georgia law or something?

A    Yeah.

MR. MIHILL:  Object to form.

BY MR. ECKER:

Q    So why do you think you didn't receive a termination notice?

A    I -- I think she was going to come back so we can talk about like getting a game plan. Because she told me to give her a minute and we were trying to figure out some things going on, and that was it.  So she never came back.

266

Q    So you met with her in Atlanta in July and she told you you were fired and she told you you would meet with her again?

A    No, she did not tell me I was fired.

Q    What did she tell you?

A    She just said, you know, it really wasn't working out good.  She's trying to see what she needs to do.  Prior to that, she told me she was going to sit down and her and Pete were going to talk because they were trying to figure out how things were looking in Alabama.

Q    So what was your understanding following this meeting with Latasha, what your role was with Contour?

A    Well, I turned everything into her, so I didn't -- I didn't know what was going to happen from there.  I didn't know it was going to be so streamline and, you know, done.  So I was kind of surprised by that.  But she never told me I was fired or anything.  She just said, I'm sorry it didn't work out.  So I assume that means it did not work out.

Q    Have you ever received any documentation related to you being fired from Contour?

A    She didn't give me any documentation prior to me leaving there.  That's why it's kind

267

of --

MR. ECKER:  I'm going to introduce Exhibit 45.  I think we're on 45.

(Rhodes Deposition Exhibit No. 45 was marked for the record.)

(The following testimony has been sealed separately and designated Attorneys' Eyes Only.)

268

<-- CONFIDENTIAL ATTORNEYS' EYES ONLY

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

Transcript of Marshal Rhodes

73
(289
to
292)

Conducted on August 25, 2025

289

A   They do.

Q   And would -- in your time working at Old National Discount Mall, you never heard anything from anyone about human trafficking going on there?

MR. MIHILL:  Object to form.  Asked and answered.

THE WITNESS:  No.

BY MR. ECKER:

Q   Do you know if anyone else working at Contour might have known about human trafficking going on there?

MR. MIHILL:  Object to form.

MR. SWIGER:  Object to form.

MR. MIHILL:  Asked and answered.

It's the same as the last question.

THE WITNESS:  No.

BY MR. ECKER:

Q   Do you know if Peter Dedvukaj knew?

MR. MIHILL:  Object to form.

MR. SWIGER:  Object to form.

MR. MIHILL:  Asked and answered.

THE WITNESS:  No.

MR. ECKER:  I think this concludes the questions that I have right now.  I will reserve the remainder of my time for

290

any redirect if necessary.

And, additionally, I'm going to hold the deposition open given that there are documents yet to be produced and there might be a need to continue the deposition.

And with that, I will reserve the remainder of my time.

EXAMINATION

BY MR. SWIGER:

Q   Ms. Ford, my name is Josh Swiger.  I introduce myself to you earlier in the deposition.  I represent Pete Dedvukaj.  I've got some questions for you, and I'm going to be much more brief.  When I say 15 minutes, it will not be two hours.

I'm going to jump around a little bit, though.  So if you don't understand where I'm coming from on a question, I want you to let me know, please.  One of the instructions that you were not given earlier is I don't want you to speculate in response to my questions.  Okay?

If you don't know the answer to one of my questions, I want you to let me know that.  If you're making an assumption, I want you to be very clear

291

about that and we can talk about it further, okay?

A   Okay.

Q   I want to start with Exhibit 3, which you've been asked a lot of questions about today.

A   Sorry.

Q   No, no rush.  Take your time.  I'd rather you keep them in order, that way when we go through we can find them.

A   Okay.

Q   So you have Exhibit 3 in front of you now?

A   Yes.

Q   Okay.  It's a letter from Louis Vuitton dated January 3rd, 2022, right?

A   Yes.

Q   Addressed to Old National Discount Mall. And then at the bottom it says, Attention, Owner/Manager, right?

A   Yes.

Q   I believe you told me before that you think you've seen this letter, correct?

A   Yes.

Q   Prior to today, yes?

A   Yes.

Q   But you don't know when you first saw

292

this letter, correct?

A   Correct.

Q   So is it possible that you first saw this letter after the raid occurred and as part of your -- the investigation into what happened and why that raid occurred?

A   Possible.

Q   Do you know one way or the other?

A   No.

Q   Okay.  So maybe it was before the raid, maybe it was after the raid.  As you sit here today, you can't tell me one way or the other whether you saw it before or after the raid?

MR. ECKER:  Objection.  Form.

THE WITNESS:  I think it was before.

BY MR. SWIGER:

Q   Why?

A   Because we were at -- we were at some type of event Contour was having and I think it got sent to us.  And it was something similar to this.  I don't think I saw this.  I just know we got something saying, hey, Louis Vuitton has sent something to the malls under the mall door and this is the paper, and then Carla sent it up.  As far as I remember.  I

CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION REDACTED

Case 1:23-cv-02818-VMC   Document 170-5   Filed 02/04/26   Page 10 of 10

Transcript of Marshal Rhodes

Conducted on August 25, 2025

74
(293
to
296)

**293**

don't know if this is it.  It doesn't look like all of it.

Q    Let's be very specific then.

So I think what you just told me is at some point in time you recall somebody telling you Louis Vuitton taped something to a door and you had a -- at a meeting there was a discussion about it, yes?

A    Correct, yes.

Q    Do you know when meeting that was?

A    No, I don't remember.

Q    And as you sit here today, you don't know if it was this letter, Exhibit 3, correct?

A    Yes, correct.

Q    Do you know if it was Exhibit 15, this complaint?

A    No.

MR. SWIGER:  Mr. Ecker, while she's doing that, can you tell me who is coming tomorrow for you guys, because I have a letter for security.

MR. ECKER:  It will just be me and the witness.

THE WITNESS:  No, I don't remember being -- this being --

**294**

BY MR. SWIGER:

Q    You don't remember it being that?

A    No.

Q    Did you actually see the document that was taped to the door or were they just talking about it at the meeting?

A    I remember it being sent -- I remember it being sent to us and we got it from our e-mails after that, from an e-mail or something, yeah.

Q    So whoever found the thing taped to the door, they scanned it and took a picture of it and they sent it to you?

A    To Carla, and Carla supplies it, yes.  As far as I can remember.

Q    I think you also told us that you think that Pete was copied on this?

A    Yes.

Q    Do you know that one way or the other?

A    I'm almost certain it was me, Latasha and Pete.

Q    On an e-mail or at the meeting?

A    After that, it was on the -- just we told him verbally at that meeting.  And then I don't think he got copied on it until we got all of the paperwork in, and then we sent it to him and Latasha.

**295**

Q    At that time, what was your understanding of what was being communicated?

A    Just that we got them to read over the findings from opening the mall.  And he was like, just make sure we get all the information in so we can respond properly and we'll get the team on it and move forward.  I don't remember word by word.

Q    Okay.  You just said reopening the mall, which suggests to me that this was after the mall had been closed.

A    It was closed, yeah.

Q    So what you're talking about, whatever it was that was taped to the door that was sent around to everybody, that would have been received after the raid, after the mall was closed, fair?

A    Oh, no.  I'm saying we were closed that particular day.  So when somebody came in to open the mall for that day of the mall, to open the mall for business, that's when I think somebody saw it -- saw it or they were driving around and it was taped on the door and then it was given to us.

Q    But you -- as you sit here today, you don't remember when that was?

A    No, I just remember we were in corporate.  We were in -- we were in Bloomfield when we received

**296**

the information.

Q    Okay.  I think you told us also that you learned of the lawsuit when a security guard sent a paperwork that was delivered to the mall?

A    That's what I'm talking about, yes.

Q    That's what you're talking about right now?

A    Yes.

Q    We've just been talking about it?

A    Yes.

Q    So this relates to the lawsuit?

A    I would assume so.

Q    Okay.  So whatever it is that you're talking about that was taped to the door of the mall, in your mind --

A    Uh-huh.

Q    -- as you're sitting here today, you think it relates to the lawsuit that brings us here today, why you're testifying?

A    Yes.

Q    Prior to that day, I think you told us you never seen any communications from Louis Vuitton specifically related to this issue; is that fair?

A    That's correct.

Q    So in terms of whatever it is that Pete